### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RENÉ GOMEZ,<br><br>Plaintiff,<br><br>v.<br><br>DENIS MCDONOUGH, *in his official capacity as Secretary, U.S. Department of Veterans Affairs*,<br><br>Defendant. | Civil Action No. 21-cv-1685 (BAH)<br><br>Chief Judge Beryl A. Howell |

### <u>MEMORANDUM OPINION</u>

Plaintiff René Gomez, a Mexican-American male and an Emergency Management Specialist at the U.S. Department of Veterans Affairs ("VA"), brings this action against Denis McDonough, in his official capacity as Secretary of Veterans Affairs, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., alleging that he has experienced racial discrimination and a hostile work environment and faced retaliation for engaging in protected activity during his employment with the VA.  Compl. ¶¶ 1-2, 23-24, ECF No. 1.  According to plaintiff, among other alleged incidents, he was told "negative and harmful comments about his cultural heritage, including his clothing and name;" he "received a lower than justified performance rating;" and he was "denied the opportunity to swap shifts in the manner and practice of his coworkers."  Pl.'s Mem. Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n"), at 10, ECF No. 12-1.  Defendant has moved to dismiss the Complaint, under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim.  Def.'s Mot. to Dismiss Pl.'s Compl. ("Def.'s

Mot."), ECF No. 11; Def.'s Mem. Supp. Mot. to Dismiss Pl.'s Compl. ("Def.'s Mem."), at 5-6, ECF No. 11.[1]  For the reasons explained below, defendant's motion is granted.

## I.   BACKGROUND

Summarized below is the factual and procedural history relevant to resolving the instant motion.

### A.   Factual Background

This litigation stems largely from interactions between plaintiff and his first- and second-level supervisors at the Office of Security Preparedness in the VA's Integrated Operations Center in Washington D.C. that occurred over a two-year period, from May 2016 to May 2018, when plaintiff claims to have been his unit's "only Mexican-American/Latino employee."  Compl. ¶¶ 22-23, 28, 115.

On May 9, 2016, plaintiff received a routine performance review from his new, immediate supervisor, Nicole Julaton, an African-American female, qualifying his performance for the October 2015-May 2016 period as "Fully Successful," which represented a downgrade from prior reviews rating his performance as "Excellent" or "Outstanding."  *Id.* ¶¶ 25-26, 29-30. Dissatisfied with this performance appraisal, plaintiff contacted Julaton to discuss his rating, but Julaton responded she was "too busy" to discuss the review with him.  *Id.* ¶ 33.  Plaintiff was thereafter also unable to discuss the performance review with his "second line supervisor," William Flinter, a White male and director of the VA's Integrated Operations Center, who did not respond to plaintiff's emails soliciting feedback.  *Id.* ¶¶ 27, 34.

---

[1]    Although the motion to dismiss itself does not specify under *which* of the Federal Rules of Civil Procedure defendant seeks relief, *see generally* Def.'s Mot., briefing in support of this motion to dismiss makes clear that the basis is pursuant to Rule 12(b)(6), *see* Def.'s Mem. at 5-6.

Two days later, on May 11, 2016, plaintiff went to Flinter's office to discuss "an important email he had received from the Department of Health and Human Services ["HHS"]," *id.* ¶ 35, apparently bypassing Julaton, his first-level supervisor.  Flinter allegedly greeted plaintiff with the phrase "What's up, José?," which "upset and offended" plaintiff, whose first name is René and is "the only Mexican-American/Latino employee" in his office.  *Id.* ¶¶ 35-37. According to plaintiff, when he explained the HHS email, Flinter "became angry[,] . . . raised his voice" and "complain[ed] that [plaintiff] does not need to come to his office every ten minutes," *id.* ¶ 38, though plaintiff provides no further detail about whether Flinter's reaction derived from plaintiff bypassing his first-line supervisor.  Following this exchange, plaintiff "felt uncomfortable and avoided going to Mr. Flinter's office when possible."  *Id.* ¶ 40.  Plaintiff does not allege he was ever called by a name other than his own by Flinter or any other colleague outside of this single instance.

Several weeks later, on May 28, 2016, Flinter allegedly emailed plaintiff "scold[ing] him for [a] time entry" and indicating that plaintiff had submitted more "time cards" than he was "scheduled for and authorized to claim" over the previous pay period.  *Id.* ¶¶ 43-44.  Plaintiff responded to Flinter that he had been approved to work those additional hours, after which plaintiff asserts that Flinter "admitted that [plaintiff] was correct and had documented his hours appropriately."  *Id.* ¶¶ 45-46.  Despite Flinter's apparently prompt acknowledgement of his error and resolution of this dispute favorably to plaintiff, plaintiff nonetheless informed Flinter's first-line supervisor of Flinter's email and requested guidance, to which email request plaintiff received no response.  *Id.* ¶ 47.

The next month, on June 24, 2016, Flinter summoned plaintiff to his office.  *Id.* ¶ 48. According to plaintiff, during the ensuing conversation, Flinter instructed plaintiff "not to speak"

to Rebecca Graves, a fellow Emergency Management Specialist, whom plaintiff had apparently "upset" after he "instructed her on how to perform certain functions that she had been doing incorrectly" and had earlier complained to Julaton about plaintiff. *Id.* ¶¶ 48-50, 91.[2]  Flinter also "snapped at [plaintiff] and told him to tuck in his shirt." *Id.* ¶ 51.  At that time, plaintiff was wearing, as he had "often" done before, a "Guayabera shirt, a button down, collared shirt common in Latino culture, which has a flared bottom and is designed not to be tucked in." *Id.* ¶¶ 52-53.  A dress code policy issued by Flinter months earlier "required men to tuck their shirts in at all times," even though the VA's dress code policy only directed employees to wear "business attire." *Id.* ¶ 56.  Plaintiff alleges that he had "frequently seen white male employees wear untucked polo shirts in the office[] who ha[d] not been directed to tuck their shirts in." *Id.* ¶ 57.  Citing the more permissive VA-wide dress code policy, plaintiff responded to Flinter that "he would not tuck the shirt in" and explained the shirt's "cultural significance" as a piece "designed to be worn as an outer-garment, not tucked in." *Id.* ¶¶ 54-55.  Following plaintiff's explanation, Flinter later told plaintiff that "he did not have a problem with the way [he] dressed." *Id.* ¶ 59.  Plaintiff does not allege that he thereafter stopped wearing Guayabera shirts to work or that he was ever formally censured for failing to comply with any dress code policy.

Plaintiff further complains about various scheduling decisions made in September and October 2016.  Specifically, he alleges that Flinter denied his request to "swap shifts" with two of his colleagues due to concerns that the requested swap would "cause[] uncertainty in the schedule," *id.* ¶¶ 60-61; that Julaton devised a schedule allowing two White officers "to work

---

[2]     Apparently, Graves's complaints about plaintiff continued since plaintiff alleges that about six months later, on December 18, 2016, plaintiff emailed Julaton multiple times to discuss "complaints being made about him by Ms. Graves," but Julaton did not respond to these emails.  Compl. ¶ 90.  Plaintiff does not specify whether Graves's complaints stemmed from the June 2016 instance in which plaintiff corrected her or other interactions Graves had with plaintiff.

significantly fewer night shifts" than non-White employees, including plaintiff, *id.* ¶¶ 62-66; and that Julaton denied one of plaintiff's leave requests without justification "other than to say it did not comport with the . . . schedule," *id.* ¶¶ 67-68.

On September 30, 2016, plaintiff contacted the VA's Equal Employment Opportunity Office ("EEO") and filed an informal complaint naming both Flinter and Julaton as "Responsible Management Officials." *Id.* ¶¶ 10, 70. Plaintiff avers that he thereafter "actively and openly participat[ed] in the [EEO] process at every step." *Id.* ¶¶ 135-136. At various dates in October 2016, Flinter and Julaton denied a string of additional requests that plaintiff made to switch shifts with coworkers, *id.* ¶¶ 75-76; for paid leave, *id.* ¶¶ 73-74; and for compensatory time after he covered a sick colleague's shift (although he was compensated with overtime pay for covering that shift), *id.* ¶¶ 78-84. In addition, plaintiff complains that, on October 2, 2016, his supervisors "did not allow [him] an adequate amount of time to recover when he transitioned from [a] night shift to day shift . . . which is typically allowed for other" employees who cover a night shift. *Id.* ¶¶ 71-72.

About two months later, on December 7, 2016, plaintiff avers that Julaton issued his "2017 Performance Plan Review" in a "public area of the office[] with multiple other employees present and within earshot," which he describes as an "unprofessional and inappropriate setting." *Id.* ¶¶ 85-86. According to plaintiff, Julaton "allowed all other employees to receive their appraisals privately in her office." *Id.* ¶ 87. The next day, on December 8, 2016, Julaton informed plaintiff and another employee that they were not allowed to use "unassigned computers and desks" in the rear area of the office. *Id.* ¶ 88. Plaintiff contradictorily avers that Julaton gave this instruction "without explaining why," *id.*, but that upon asking for a reason, Julaton explained "that the computers were only for Watch Officers assigned to those desks," *id.*

¶ 89.  Then, on January 4, 2017, plaintiff learned that Flinter had selected a White colleague for a new "GS-13 level position that would act similar to a supervisor" in plaintiff's unit during the night shift.  *Id.* ¶ 92.  Plaintiff asserts that he "was denied the opportunity to seek" this new supervisory role, "which would have been a promotion for him, because . . . Flinter did not post the position openly for others to apply," and instead "privately chose" one of plaintiff's two White colleagues "without competition."  *Id.* ¶¶ 93-94.

Later that year, on September 10, 2017, plaintiff claims that Bobby Small, the Operations Branch Chief for VA's Integrated Operations Center, ordered him to empty "a dumpster full of trash" while in the presence of three other employees at a conference room.  *Id.* ¶¶ 105-106.  When plaintiff refused to empty the dumpster, Small allegedly responded: "I will remember this."  *Id.* ¶ 108.  As the "only Latino . . . [o]fficer," plaintiff complains that Small's command to empty the dumpster "in front of his colleagues made [him] feel that he was being singled-out, humiliated, and disrespected by a supervisor . . . and threatened for not performing a demeaning task."  *Id.* ¶ 110.  About ten months after this interaction, on May 7, 2018, Small allegedly ordered two of plaintiff's colleagues "not to answer any phone calls from" plaintiff while they were at an offsite event and plaintiff remained at the office, which plaintiff asserts "isolated and ostracized him from his team[] and threatened his ability to perform his job effectively."  *Id.* ¶¶ 113-114.  Finally, plaintiff alleges that, on May 24, 2018, Small ordered one of plaintiff's colleagues to "instruct [plaintiff] on the expected quality of a work assignment" that plaintiff was "regularly" tasked with editing.  *Id.* ¶¶ 115-117.

### B.    Administrative and Procedural Background

As noted, plaintiff made an initial contact with the VA's EEO on September 30, 2016.  *Id.* ¶ 10.  Plaintiff thereafter filed, on November 2, 2016, a formal complaint with the EEO alleging racial discrimination, hostile work environment, and reprisal for protected activity.  *Id.* ¶

11; *see also* Def.'s Mem. at 4.  On January 25 and March 20, 2017, plaintiff filed two amendments to his complaint, both of which amendments the EEO accepted for investigation. Compl. ¶ 12.  Following investigation of his EEO complaint and his receipt of the EEO's Report of Investigation—the outcome of which is not specified in the record—plaintiff requested, on August 23, 2017, a hearing before the U.S. Equal Employment Opportunity Commission ("EEOC").  *Id.* ¶ 13.

Two years later, on October 16, 2019, an EEOC Administrative Judge issued a decision rejecting each of plaintiff's claims and entering summary judgment in favor of the VA.  *Id.* ¶ 16; *see also* Pl.'s Opp'n, Ex. C, Oct. 16, 2019 EEOC Decision ("EEOC Decision"), ECF No. 12-4. The EEOC Decision concluded, upon review of plaintiff's allegations of discrimination between May 9, 2016 and March 2, 2017, EEOC Decision at 3-4, that plaintiff "fail[ed] to present a *prima facie* case of discrimination and harassment" and that he had likewise "fail[ed] to demonstrate a nexus between . . . allegedly discriminatory actions and any of his protected bases," *id.* at 10. The EEOC Decision found "not one shred of actual evidence, other than [plaintiff's] bare assertions, conclusory allegations, and self-serving statements, that the alleged discriminatory actions were based on" plaintiff's race or national origin.  *Id*. at 13; *see also id.* at 10 (noting record was "devoid of any indication, beyond [plaintiff's] bare assertions, that discriminatory motives animated any of the [VA's] actions in this case or that the [VA's] articulated reasons for any of its actions are pretextual").  The VA adopted this EEOC Decision as its Final Order regarding plaintiff's EEO complaint on October 22, 2019.  Compl. ¶ 18.  Plaintiff then appealed this Final Order to the EEOC's Office of Federal Operations, which, on March 25, 2021, affirmed the VA's determination that plaintiff had not been subjected to discrimination.  *Id*. ¶ 19;

*see Jerry V. v. McDonough*, EEOC DOC 2020001260, 2021 WL 1239495, (E.E.O.C. Mar. 25, 2021).[3]

On June 23, 2021, plaintiff filed this lawsuit, *see* Compl. at 1, asserting three claims: (1) racial discrimination based on plaintiff's "Mexican-American/Latino descent," *id.* ¶¶ 118-133 (Count I); (2) retaliation for initiating protected EEO activity on September 30, 2016, *id.* ¶¶ 134-140 (Count II); and (3) a hostile work environment as a result of both his race and in retaliation for plaintiff's decision to initiate EEO proceedings, *id.* ¶¶ 141-152 (Count III).  After a series of extension requests from both parties prolonged the briefing for dispositive motions, *see* Min. Orders (Aug. 26, 2021, Oct. 5, 2021, and Dec. 13, 2021), defendant's motion to dismiss is now ripe for resolution.

## II.   LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  In deciding a motion under Rule 12(b)(6), the court must consider the whole complaint, accepting all factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555.  Courts do not, however, "assume the truth of legal conclusions, nor

---

[3]        The EEOC "randomly assigned a pseudonym replacing [plaintiff's] name for . . . purposes" of publishing its final decision affirming the administrative judge's rejection of all the claims plaintiff presented in his EEO complaint.  Def.'s Mem. at 5 n.2.

do [they] 'accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)). "In determining whether a complaint fails to state a claim," a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [courts] may take judicial notice." *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997)).

## III.   DISCUSSION

Defendant seeks dismissal of this action on grounds that: (1) plaintiff failed to exhaust administrative remedies as to his allegations regarding three instances of Small's conduct in 2017 and 2018, Def.'s Mem. at 7-9; (2) the allegations conceded to be administratively exhausted are not sufficiently adverse to sustain Title VII liability for either racial discrimination or retaliation, *id.* at 9-15; and (3) plaintiff's allegations "fail to rise to the level of severe or pervasive conduct to constitute a hostile work environment as a matter of law," Def.'s Mot. at 1; *see also* Def.'s Mem. at 15-17.  Each of these arguments is addressed in turn.

### A.   Failure to Exhaust Administrative Remedies

According to defendant, plaintiff's Complaint "contains several allegations that were not presented to the [VA] for investigation and thus were not exhausted . . . and should be dismissed as untimely." Def.'s Mem. at 8.  Specifically, defendant asserts that plaintiff failed to exhaust his claims as they relate to plaintiff's three alleged interactions with Operations Branch Chief Bobby Small between September 10, 2017 and May 24, 2018, *see id.*; Def.'s Reply Supp. Mot. to Dismiss ("Def.'s Reply"), at 1, ECF No. 14, when plaintiff claims that Small: (1) ordered him to empty a dumpster in front of colleagues, Compl. ¶¶ 105-110; (2) instructed two colleagues not to answer plaintiff's calls while they participated at an offsite event and plaintiff was at the

office, *id.* ¶¶ 111-114; and (3) directed another colleague to instruct plaintiff on the expected

quality of an assignment that plaintiff was often tasked with preparing, *id.* ¶¶ 115-117.

Exhaustion of administrative remedies in the Title VII context is not a jurisdictional

requirement, but an affirmative defense that the defendant "bears the burden of pleading and

proving." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).  "As with other

affirmative defenses, the defendant may seek dismissal under Rule 12(b)(6) if the facts that give

rise to the exhaustion defense are clear from the face of the complaint."  *Green v. Haaland*, No.

21-cv-329 (RDM), 2022 WL 898864, at *3 (D.D.C. Mar. 28, 2022) (cleaned up); *see also Blue v.*

*Jackson*, 860 F. Supp. 2d 67, 72 (D.D.C. 2012) ("[A] 12(b)(6) motion to dismiss . . . is the

appropriate vehicle to challenge an alleged failure to exhaust administrative remedies under Title

VII." (internal citations omitted)).

In evaluating such an exhaustion defense, a court can consider "the facts alleged in the

complaint, any documents either attached to or incorporated in the complaint and matters of

which a court may take judicial notice," *Horsey v. U.S. Dep't of State*, 170 F. Supp. 3d 256, 265

(D.D.C. 2016) (quoting *Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 85 (D.D.C. 2012)),

"without converting the motion into one for summary judgment," *Banneker Ventures, LLC v.*

*Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015).  *See also Vasser v. McDonald*, 228 F. Supp. 3d

1, 9-10 (D.D.C. 2016) ("In the context of exhaustion, courts [may] rely upon administrative

orders and . . . complaints without converting the motion into one for summary judgment when

the documents . . . are integral to [the] exhaustion of administrative remedies." (internal citations

omitted)).  Defendant is correct that, assuming as true the allegations set forth in the

Complaint—including the administrative records referenced therein—plaintiff failed to

administratively exhaust his claims involving Bobby Small.

"Before a federal employee can file suit against a federal agency for violation of Title VII, the employee must run a gauntlet of agency procedures and deadlines to administratively exhaust his . . . claims." *Crawford v. Duke*, 867 F.3d 103, 105 (D.C. Cir. 2017); *see also* 42 U.S.C. § 2000e-16(c). The exhaustion requirement "serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision," *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (cleaned up), and it "ensure[s] that the federal courts are burdened only when reasonably necessary," *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985). The EEOC has issued detailed procedures to govern the administrative resolution of employment discrimination claims against federal agencies under Title VII. *See* 42 U.S.C. § 2000e-16(b); 29 C.F.R. § 1614.105. As relevant here, these procedures require at the outset that employees "who believe they have been discriminated against . . . must consult a[n] [EEO] Counselor prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). This initial contact with an EEO Counselor must take place "within 45 days of the date of the matter alleged to be discriminatory." *Id.* § 1614.105(a)(1). After requesting an administrative hearing, an employee may seek to amend his complaint by filing "a motion with the administrative judge . . . to include issues or claims like or related to those raised in the complaint." *Id.* § 1614.106(d).

When an employee alleges he experienced a "discrete retaliatory or discriminatory act," the exhaustion inquiry focuses on that particular act. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed [administrative] charges." *Id.* at 113. In other words, a "'Title VII plaintiff must timely exhaust administrative remedies *for each discrete act alleged*,' even if the acts are related." *Mount v. Johnson*, 36 F. Supp. 3d 74, 84 (D.D.C.

2014) (Brown Jackson, J.) (quoting *Laughlin v. Holder*, 923 F. Supp. 2d 204, 209 (D.D.C. 2013)) (emphasis in original).  By contrast, a hostile work environment claim is subject to a less stringent exhaustion requirement.  Given that the "very nature" of a hostile work environment claim "involves repeated conduct," the unlawful employment practice "cannot be said to occur on any particular day."  *Morgan*, 536 U.S. at 115.  For this reason, if "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court" regardless of whether the act was administratively exhausted.  *Id.* at 117.

Here, as evident from the Complaint and documents referenced therein, plaintiff did not exhaust the available administrative remedies as to the three discrete actions that Small allegedly took against him between September 10, 2017 and May 24, 2018 for purposes of his discrimination and retaliation claims.  As defendant explains and is reflected in the EEOC administrative decisions referenced in the Complaint, "the [VA] accepted 19 instances of . . . alleged discrimination as actionable, allegations which occurred between May 9, 2016 and March 2, 2017."  Def.'s Mem. at 8; *see also Gomez*, 2021 WL 1239495, at *1 (E.E.O.C. Mar. 25, 2021); EEOC Decision at 3-4.  Indeed, plaintiff alleges that he last successfully amended his EEO complaint on March 20, 2017, *see* Compl. ¶ 12—almost six months *before* plaintiff's first alleged incident with Small in September 2017, *see id.* ¶¶ 105-110.

Neither the Complaint nor underlying administrative decisions indicate that plaintiff consulted an EEO counselor within 45 days of any of the three alleged incidents with Small. These incidents—*i.e.*, Small's directives (1) that plaintiff empty a dumpster, *id.* ¶¶ 105-110; (2) that two colleagues ignore plaintiff's calls, *id.* ¶¶ 111-114; and (3) that another colleague remind plaintiff about the expected quality of a work assignment, *id.* ¶¶ 115-117—nevertheless each amounted to a "discrete retaliatory or discriminatory act" that "start[ed] a new clock for filing

charges alleging that act" before an EEO counselor.  *Morgan*, 536 U.S. at 110, 113.  This

required plaintiff, as a threshold matter, to seek EEO counseling after each alleged incident of

discrimination or retaliation with Small.  *See Mount*, 36 F. Supp. 3d at 84; 29 C.F.R. §

1614.105(a).  Defendant is correct that plaintiff nowhere suggests that he sought such counseling

within the requisite 45 days or at any other time.  *See* Def.'s Mem. at 8; Def.'s Reply at 1. [4]

Consequently, plaintiff failed administratively to exhaust his allegations about Small to the

extent his discrimination and retaliation claims are predicated on those allegations.  *See Mount*,

36 F. Supp. at 84 (noting majority rule in this District that "a plaintiff alleging discrete acts of

discrimination or retaliation—including those filed after an administrative complaint—must

exhaust his administrative remedies with respect to the later occurring incidents even if they are

related to the claims in the administrative complaint"); *accord Hunter v. District of Columbia*,

797 F. Supp. 2d 86, 95 (D.D.C. 2011) ("Courts in this district have applied *Morgan* in holding

that a plaintiff must exhaust his administrative remedies with respect to distinct acts that

---

[4]        Plaintiff attempts to counter defendant's exhaustion defense stating that, "before an administrative judge
was assigned" to his case in June 2018, he "contacted the Agency EEO office and the EEOC [via email] seeking to
amend his claims" and add allegations regarding Small—which request plaintiff acknowledges was ineffective since
the EEOC Decision only accounted for his allegations in the May 9, 2016 to March, 2, 2017 period.  Pl.'s Opp'n at
7-9.  Plaintiff has attached the purported June 2018 emails seeking amendment of his administrative claims to his
memorandum in opposition to the motion to dismiss.  *See* Pl.'s Opp'n, Exs. A & B, June 2018 Emails and
Attachment from Plaintiff to EEO ("June 2018 Emails"), ECF Nos. 12-2, 12-3.  The Complaint fails to reference
this alleged June 2018 effort to amend his claims or the emails attached to plaintiff's opposition brief; as such,
consideration of this extraneous material in resolving the instant motion to dismiss would require the Court to treat
the motion as one for summary judgment.  *See* FED. R. CIV. P. 12(D) ("If, on a motion under Rule 12(b)(6) . . .
matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for
summary judgment under Rule 56.").  Reliance on any materials beyond the pleadings is unnecessary here, and thus
the instant motion need not be converted into one for summary judgment, because the Complaint, including
referenced administrative decisions, make plain—and plaintiff does *not* contest—that plaintiff failed to fulfill the
threshold exhaustion requirement of reporting the three incidents involving Small to an EEO counselor within the
mandated 45-day period.  *See Harvey v. Colvin*, 13-cv-1957 (RMC), 2015 WL 4078223, at *6 (D.D.C. July 1, 2015)
("The law of this Circuit makes clear that conversion of a motion to dismiss to one for summary judgment is only
required when the district court "refers to materials outside the pleadings in *resolving* a 12(b)(6) motion." (quoting
*Kim v. U.S.*, 632 F.3d 713, 719 (D.C. Cir. 2011)); *see also Deegan v. Strategic Azimuth LLC*, 768 F. Supp. 2d 107,
112 (D.D.C. 2011) (Lamberth, C.J.) (excluding consideration of "Non-Disclosure Agreements" attached to
plaintiff's opposition to motion to dismiss and accordingly not treating 12(b)(6) motion as one for summary
judgment).

occurred after the filing of an administrative charge.").  These allegations about Small may thus not be considered in assessing Count I (Discrimination) and Count II (Retaliation) of the Complaint. [5]

Plaintiff's allegations about Small are also time barred for purposes of the hostile work environment claim asserted in Count III.  As noted above, because "[t]heir very nature involves repeated conduct," hostile environment claims are "different in kind from discrete acts" and thus "the entire time period of the hostile environment may be considered by a court for . . . purposes of determining liability."  *Morgan*, 536 U.S. at 115, 117.  The D.C. Circuit has emphasized, however, that this more lenient approach to administrative exhaustion of hostile environment claims announced in *Morgan* "is not . . . an open sesame to recovery for time-barred violations." *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011).  Incidents that have been administratively exhausted and those that have not "can qualify as 'part of the same actionable hostile environment claim' *only if* they are adequately linked into a coherent hostile environment claim" such that, "for example, they 'involve the same type of employment actions, occur relatively frequently, and are perpetrated by the same managers.'"  *Id.* (quoting *Morgan*, 536 U.S. at 120-121) (emphasis added).

Plaintiff asserts that his unexhausted allegations about Small meet this standard, arguing they are "another three acts of hostility perpetrated by a higher-level manager which follow[] on the heels of the dates of the already-accepted claims in this matter."  Pl.'s Opp'n at 8.  Not so. The three incidents with Small that occurred between September 2017 and May 2018 involved a different manager, completely different types of conduct, and did not occur frequently or repeatedly.

---

[5]      As discussed *infra* n.7, even assuming the allegations about Small were administratively exhausted and true, plaintiff has failed to show that any adverse employment action was associated with the alleged conduct.

At the outset, the incidents that the EEO accepted for investigation and were addressed in the EEOC Decision *only* involved interactions between plaintiff and his first- and second-line supervisors, Julaton and Flinter.  *See* EEOC Decision at 3-4.  Neither the VA's EEO nor the EEOC examined any allegation involving Small.  *See id.*  Moreover, the incidents with Julaton and Flinter considered in the administrative process mainly entailed comments that plaintiff interpreted as insensitive to his culture and ethnic heritage, Compl. ¶¶ 35-37, 51-57; disagreements about the contents and delivery of plaintiff's routine performance reviews, *id.* ¶¶ 25-26, 29-30, 85-87; and denials of plaintiff's requests for leave and to switch shifts with coworkers, *see, e.g.*, *id.* ¶¶ 60-68, 71-72, 75-76, 78-84.  These allegations share little in common, if anything, with plaintiff's claim that, in the span of about eight months, Small—who plaintiff does not even allege was one of his immediate supervisors—once ordered him to empty a dumpster in others' presence, *id.* ¶¶ 105-106, and months later directed colleagues attending an off-site meeting not to answer plaintiff's calls from the work-site, *id.* ¶¶ 113-114, and then to provide him with unsolicited guidance as to the expected quality of his work-product, *id.* ¶¶ 115-117.  The allegations pertaining to Small thus not only implicate different subjects but are also entirely different in kind and frequency from those relating to Julaton and Flinter, and as such cannot be "adequately linked into a coherent hostile environment claim."  *Gotbaum*, 662 F.3d at 1251.  Accordingly, the three unexhausted allegations about Small will be disregarded in evaluating Count III (Hostile Work Environment) of plaintiff's Complaint.

### B.    Discrimination and Retaliation (Counts I and II)

Defendant contends that Count 1 (Discrimination) and Count II (Retaliation) of plaintiff's complaint must be dismissed because "the allegedly discriminatory or retaliatory conduct that [plaintiff] has administratively exhausted . . . [is] not sufficiently adverse for Title VII liability." Def.'s Mem. at 9.

"[T]o present a viable claim of employment discrimination under Title VII, a plaintiff must show that he suffered an adverse employment action." *Douglas v. Donovan*, 559 F.3d 549, 551-552 (D.C. Cir. 2009).  An adverse employment action sufficient to sustain a Title VII discrimination claim must amount to a "'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Id.* at 552 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  The adverse action must be so significant that it "affect[s] the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Id.* (citations omitted).  The Supreme Court has recognized that, in most cases, an adverse employment action "inflicts *direct* economic harm." *Burlington Indus., Inc.*, 524 U.S. at 762 (emphasis added).  This threshold requirement prevents courts from being weighed down with "frivolous suits over insignificant slights," *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001), since "not everything that makes an employee unhappy is an actionable adverse action," *Douglas,* 559 F.3d at 552; *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (explaining that Title VII "does not set forth a general civility code for the American workplace" (internal citations omitted)).

A retaliation claim under Title VII similarly requires a plaintiff to allege that the employer took a "materially adverse action" against him. *See Allen v. Johnson*, 795 F.3d 34, 38-39 (D.C. Cir. 2015).  In the retaliation context, however, "the 'adverse action' concept has a broader meaning." *Gotbaum,* 662 F.3d at 1249.  "[A]ctions giving rise to [retaliation] claims are not limited to discriminatory actions that affect the terms and conditions of employment, but reach any harm that well might have dissuaded a reasonable worker from making or supporting a

charge of discrimination." *Id.* (citations omitted).  Still, Title VII protects individuals "not from all retaliation, but from retaliation that produces an injury or harm."'  *Burlington N.*, 548 U.S. at 67; *see also Hornsby v. Watt*, No. 17-5001, 2017 U.S. App. LEXIS 22849, at *5-6 (D.C. Cir. Nov. 14, 2017) (observing that both Title VII discrimination and retaliation "require an inquiry into whether a plaintiff has suffered objectively tangible harm," and that "while the scope of actions covered by Title VII's substantive provision and its anti-retaliation provisions differ, the magnitude of harm that plaintiff must suffer does not"' (quoting *Hornsby v. Watt*, 217 F. Supp. 3d 58, 66 (D.D.C. 2016)).  Work-related retaliation must therefore have "tangible job consequences" to qualify as materially adverse.  *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008)).  Actions that result in objectively tangible harm are certainly more likely to dissuade a reasonable worker from pursuing a claim that "petty slights, minor annoyances, and simple lack of good manners." *Burlington N.*, 548 U.S. at 68.  Notwithstanding how genuinely upset plaintiff may have been by instances of his supervisors' conduct, his exhausted allegations fall short of the threshold adverse action requirement necessary to state a claim for both discrimination and retaliation under Title VII.

Citing no authority from this Circuit or elsewhere, plaintiff asserts that, for purposes of his racial discrimination claim, he "has suffered a tangible and objective harm as direct result of [d]efendant's unlawful conduct" by: (1) receiving "a lower than justified performance rating;" (2) being "forced to receive a performance evaluation in a public space in front of other employees, which was humiliating;" (3) being "denied the opportunity to swap shifts in the manner and practice of his coworkers;" (4) being "forced to work night shifts while [W]hite workers received the lion's share of day shifts;" (5) being "subjected to negative and harmful

comments about his cultural heritage, including his clothing and his name;" and (6) being "prevented from competing for a role that was awarded to a less experienced coworker." Pl.'s Opp'n at 10.  None of these actions, however, resulted in a "significant change in benefits" for plaintiff, *see Douglas*, 559 F.3d at 552, nor amount to a "significant change in [plaintiff's] employment status" because they are not comparable to firing, reassigning, or failing to promote, *see id*.

Despite claiming that he "was denied the opportunity to seek the Lead Watch Officer position, which would have been a promotion for him, because . . . Flinter did not post the position openly for others to apply," Compl. ¶ 93, plaintiff does not allege that the VA "was required to advertise the position, . . . to accept applications for the position [or] . . . to advertise the position but chose not to due to [plaintiff's] race and protected activity," Def.'s Reply at 5. Indeed, plaintiff acknowledges that, "[t]o state a claim for discrimination relative to an employer's failure to promote," he was required to allege, among other things, that "he *applied for* and *was qualified for* a job for which the employer was seeking applicants."  Pl.'s Opp'n at 11 (citing *Ramseur v. Perez*, 80 F. Supp. 3d 58, 66 (D.D.C. 2015)) (emphasis added).  Plaintiff has made no such allegation here.  While he may be disappointed that another employee was selected Lead Watch Officer, that disappointment—without more—does not amount to an actionable adverse employment action.

Moreover, plaintiff's criticisms of his performance review process—that he received a lower than justified performance rating and Julaton conducted one of his performance reviews in public—are likewise not cognizable as adverse actions under Title VII because plaintiff does not allege they affected his "grade or salary," *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003), or otherwise resulted in "objectively tangible harm," *Douglas*, 559 F.3d at 552; *see also id.*

("[P]erformance evaluations ordinarily are not actionable under Title VII.").  The "lower than justified performance rating" that plaintiff takes issue with, Pl.'s Opp'n at 10, is one that qualified him as "Fully Successful" rather than "Excellent" or "Outstanding" as in prior appraisals, Compl. ¶¶ 29-31.  Plaintiff identifies no tangible harm flowing from this positive, though not the highest, performance evaluation.  In any event, what tangible harm could stem from an indisputably positive performance review finding that an employee is "Fully Successful" in the execution of his duties would be difficult to discern.  *Cf. Taylor*, 350 F.3d at 1292-93 (concluding that even placement of plaintiff on "Performance Improvement Plan" was *not* an adverse employment action).

Plaintiff's assertion that he was "humiliated" by Julaton's decision to provide his 2017 Performance Plan Review in a public setting fares no better.  *See* Pl.'s Opp'n at 10; *see also* Compl. ¶¶ 85-87.  Time and again, the D.C. Circuit has stressed that "public humiliation or loss of reputation" do not give rise to actionable adverse employment actions.  *Gotbaum*, 662 F.3d at 1249; *see also Stewart v. Evans*, 275 F.3d 1126, 1135-26 (D.C. Cir. 2002).  Flinter's calling of plaintiff by another name (José) on one occasion, Compl. ¶ 35, and directive that plaintiff tuck in his Guayabera shirt, *id.* ¶¶ 51-52—remarks which plaintiff reasonably could have considered culturally insensitive or disrespectful—similarly do not qualify as adverse actions.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (internal citations omitted)); *Jones v. Bush*, 160 F. Supp. 3d 325, 346 (D.D.C. 2016) ("[A]cts of disrespect or rudeness are nothing like the ultimate employment decisions typically deemed adverse.").  Indeed, after plaintiff refused to tuck in his Guayabera shirt, and explained the shirt's cultural significance and how it is worn to Flinter,

19

Compl. ¶¶ 54-55, Flinter told him that "he did not have a problem with the way [he] dressed," *id.* ¶ 59, suggesting that his supervisor learned from the incident.

Finally, plaintiff is no more successful in establishing that his supervisors' sporadic denial of requests for leave and to swap shifts with his colleagues, *see* Compl. ¶¶ 60, 67, 75, 100, comprise an adverse employment action. While these occasionally denied requests may have represented an inconvenience, plaintiff has not alleged that they generated a "significant change" in his pay, benefits, or other terms of employment. *See Douglas*, 559 F.3d at 552; *Grube v. Lau Indus.*, 257 F.3d 723, 728 (7th Cir. 2001) (holding change in working hours did not amount to adverse employment action where change was unaccompanied by modification in pay, title, or significantly diminished job responsibilities); *cf. Ginger v. District of Columbia*, 527 F.3d 1340, 1343-44 (D.C. Cir. 2008) (holding that plaintiffs' transfer from a permanent shift schedule to a rotating shift schedule constituted an adverse employment action). Plaintiff's allegation that Julaton allowed White employees to "work significantly fewer night shifts than" plaintiff and other non-White employees also fails as an adverse action on a similar basis. Compl. ¶¶ 63-66. Other than averring that he "faced difficulty with his sleep schedule and daily activities because of the frequent night shifts," *id.* ¶ 66, plaintiff makes no effort to explain how working a higher number of night shifts than his peers amounted to a significant change in his employment status or caused objectively tangible harm. *See Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 848 (D.C. Cir. 2001) (noting that "assignment to a less desirable task does not create liability under Title VII unless it results in a diminution in pay or benefits or affects such things as future employment opportunities" so that plaintiff suffers "objectively tangible harm").[6]

---

[6]     Plaintiff alleges that, from August 2015 to May 2016, one of his White colleagues, Kevin Carter, was scheduled to work 88 day shifts and 46 night shifts (134 shifts total). Compl. ¶ 64. Presumably for that same period, plaintiff asserts he was scheduled to work 39 day shifts and 80 night shifts (119 shifts total). *Id.* ¶ 65. Carter's schedule—requiring him to work 15 additional shifts in the same period—appears, by the asserted numbers,

Notably, plaintiff does not even allege that he requested to be placed on less night shifts and that those requests were denied, or that he even expressed dissatisfaction to his supervisors about his night shift schedule.  *See, e.g.,* Compl. ¶ 71 (only complaining that, on October 2, 2016, Julaton "did not allow [plaintiff] an adequate amount of time to recover when he transitioned from night shift to day shift").  Plaintiff therefore has no actionable Title VII discrimination claim based on any of this conduct.

Turning to plaintiff's retaliation claim, he avers that the VA retaliated against him after he initiated EEO activity in September 2016 by: (1) denying him the opportunity to compete for the Lead Watch Officer position; (2) incidentally denying his use of leave and ability to coordinate shift changes with coworkers; and (3) conducting his 2017 Performance Plan Review in a public setting.  Compl. ¶ 137.  Defendant correctly counters, however, that these "incidents, even under a more broad 'materially adverse action' standard, do not meet the requisite level surpassing that of 'petty slights, minor annoyances, and simple lack of good manners.'"  Def.'s Reply 4-5 (quoting *Burlington N.*, 548 U.S. at 67-68).

As discussed above in connection with the discrimination claim, plaintiff alleges no facts showing that these purported retaliatory acts "resulted in tangible, objective harm such that these actions were materially adverse" or "affect[ed] any benefits or terms of [plaintiff's] employment."  *Wesley v. Georgetown Univ.*, No. 18-1539 (BAH), 2018 WL 5777396, at *7 (D.D.C. Nov. 2, 2018); *see also Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (defining materially adverse actions as those that demonstrate an objectively tangible harm); *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) ("Actionable retaliation claims are

---

to be more demanding than that of plaintiff.  These metrics undercut plaintiff's claim that Julaton provided Carter, who on plaintiff's admission was required to work more than him, with "preferable treatment" in the schedule as a general matter.  *Id.* ¶ 62.

limited to those where an employer causes material adversity, not trivial harms." (citations

omitted)).[7]  For instance, the only purported harm that plaintiff ascertains regarding any of these

incidents—the "damage [to] his reputation amongst his peers" that followed from Julaton's

alleged "public discussion of his performance appraisal," Compl. ¶ 137—is neither significant

nor tangible.  *See Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015) ("[T]he question is

whether . . . retaliation caused a significant, tangible harm."); *Baloch*, 550 F.3d at 1199

("[P]erformance reviews typically constitute adverse actions *only when* attached to financial

harms." (emphasis added)).  Plaintiff has thus not met his burden to establish that these actions

were materially adverse as required to state a retaliation claim under Title VII.

Accordingly, defendant's motion to dismiss Count I (Discrimination) and Count II

(Retaliation) of plaintiff's Complaint for failure to allege a sufficiently adverse employment

action must be granted.

### C.    Hostile Work Environment (Count III)

Lastly, defendant seeks dismissal of plaintiff's claim in Count III, alleging a hostile work

environment based on plaintiff's race and participation in protected EEO activity.  Def.'s Mem.

15-17; Def.'s Reply at 6.  Dismissal of this count is also warranted.

A hostile work environment is one "permeated with discriminatory intimidation, ridicule,

and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

employment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  To determine "whether an

actionable hostile work environment claim exists," courts must look "to all the circumstances,

---

[7]     Even if administratively exhausted, which they were not, as discussed *supra* in Part III.A, plaintiff's three
alleged incidents involving Small—*i.e.*, Small's directives (1) that plaintiff empty a dumpster, Compl. ¶¶ 105-110;
(2) that two colleagues ignore plaintiff's calls, *id.* ¶¶ 111-114; and (3) that another colleague remind plaintiff about
the expected quality of a work assignment, *id.* ¶¶ 115-117—would fail on the same basis that they are insufficiently
adverse to maintain either a discrimination or retaliation claim under Title VII.

including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Morgan*, 536 U.S. at 116 (internal citations omitted).  A plaintiff fails to establish a hostile work environment claim if the alleged conduct "is not severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris*, 510 U.S. at 21.  Dismissal is thus appropriate when a complaint lacks allegations of behavior "so objectively offensive as to alter the conditions of [his] employment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

Plaintiff alleges that the VA created a hostile work environment by: (1) giving him a lower than justified performance rating; (2) delivering his performance evaluation in public; (3) denying requests for leave and to swap shifts; (4) subjecting him to "negative and hurtful comments" regarding his cultural heritage with regards to his clothing and being called "José;" and (5) not allowing him to compete for the Lead Watch Officer position.  Compl. ¶ 143. Nothing about these allegations, taken in isolation or together, is sufficiently pervasive or adverse to give rise to a hostile work environment claim.  *See Harris*, 510 U.S. at 21; *but see Menoken v. Dhillon*, 975 F.3d 1, 7 (D.C. Cir. 2020) (finding that plaintiff stated claim for retaliatory hostile work environment by alleging her "employer's deliberate attempts" to interfere with plaintiff's "finances and access to healthcare").  Rather, plaintiff's hostile work environment claim "is essentially an amalgamation of disparate treatment claims" and courts "have been reluctant to transform such allegations into a cause of action for hostile work environment." *Wade v. District of Columbia*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011); *see also Bell v. Gonzales*, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) ("Occasional instances of less favorable treatment involving ordinary daily workplace decisions are not sufficient to establish a hostile

work environment.").  Although a hostile environment claim by its "very nature involves

repeated conduct," *Morgan*, 536 U.S. at 115, plaintiff's hostile environment claim is not

premised on repeated conduct but largely on discrete acts. [8]

       To begin, plaintiff fails to allege the sort of "deeply offensive" discriminatory comments

or conduct that, combined with other allegations of interference and denied privileges, might

state a hostile work environment claim.  For instance, the D.C. Circuit has upheld a plaintiff's

hostile work environment claim based on the use of a "deeply offensive racial epithet" together

with another racially offensive comment, the denial of a raise, and plaintiff's documented

medical leave as the result of workplace stress.  *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572,

577 (D.C. Cir. 2013) (per curiam); *see also Wise v. Ferriero*, 842 F. Supp. 2d 120 (D.D.C. 2012)

(holding that plaintiff adequately stated hostile work environment claim by alleging threats of

discipline based on false accusations of misconduct, denials of promotion, exclusion from

trainings, and a manager's use of a "uniquely offensive" and severe racist epithet).  Here, the

only possibly derogatory comment alleged in reference to plaintiff's race or national origin—the

instance in which Flinter greeted plaintiff as "José," instead of René, Compl. ¶ 35 —is not

comparable to a racial epithet, could have been "a simple mistake" lacking any discriminatory

animus, Def.'s Reply at 6, and in any event was an isolated incident that did not reoccur.

---

[8]     The D.C. Circuit has recognized a "special type" of "retaliatory hostile work environment claim" that may
be established "by alleging a series of individual acts that may not be actionable on their own but become actionable
due to their cumulative effect."  *Menoken*, 975 F.3d at 5-6 (internal citations omitted).  These acts, however, must be
"adequately linked such that they form a coherent hostile environment claim" and still be "of such severity or
pervasiveness as to alter the conditions of employment and create an abusive working environment." *Id.* at 6
(internal citations omitted).  Although the Complaint asserts a hostile work environment claim based on both racial
discrimination *and* retaliation for filing an EEO complaint, *see* Compl. ¶¶ 142, 144, plaintiff does not argue that his
allegations are alternatively actionable under the distinct parameters of this "special type" of retaliatory hostile work
environment claim.  Pl.'s Opp'n at 12 (only noting that "[t]o state a claim for a hostile work environment, a plaintiff
must allege conduct that would not occur but for the protected characteristic, that is attributable to management, and
that is sufficiently severe or pervasive to alter the employment relationship").  Regardless, plaintiff would be unable
to move forward even under this special type of claim because, as discussed above and *infra*, he does not allege
conduct that was severe or pervasive enough to change the conditions of his employment. *See Menoken*, 975 F.3d at
6.

Plaintiff's other allegations in support of his hostile work environment claim—his receipt of a lower performance rating, the public delivery of his annual performance review, several denied requests for leave and to swap shifts, and his non-selection for the Lead Watch Officer role—are simply not "objectively offensive as to alter the conditions" of plaintiff's employment. *Oncale*, 523 U.S. at 81; *see also Harris*, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."). To the contrary, these allegations entail ordinary actions taken by supervisors at the workplace. In this District, such "work-related actions by supervisors" are typically not found sufficient to state a hostile work environment claim. *Wade*, 780 F. Supp. 2d at 19; *see also Outlaw v. Johnson*, 49 F. Supp. 3d 88, 92 (D.D.C. 2014) (dismissing hostile work environment count "referring only to promotion denials, a subjective performance review, and being hired at a lower grade than Caucasian employees"); *Laughlin v. Holder*, 923 F. Supp. 2d 204, 219-220, 221 (D.D.C. 2013) (deeming insufficient allegations of denied promotions and bonuses, interference with efforts to carry out certain job duties, and pressure to retire); *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[T]he removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context."); *Bell*, 398 F. Supp. 2d at 92 (finding that plaintiff's exclusion from informal chain of command, close monitoring of work, missed opportunities for teaching, travel, and high-profile assignments, and reassignment to another unit did not amount to a hostile work environment because "they cannot fairly be labeled abusive or offensive"). Plaintiff has therefore failed to state a claim for hostile work environment and defendant's motion to dismiss must also be granted as to Count III.

**IV.    CONCLUSION**

For the foregoing reasons, defendant's motion to dismiss for failure to state a claim is granted.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  May 10, 2022

_____
BERYL A. HOWELL
Chief Judge